Your honors, thank you very much. Frank Press on behalf of the appellant. So what we have here is an exposure case where the plaintiff was exposed to chemicals while cleaning a restroom at the Nelson Center as part of the Springfield Park District. And the issues we have for you today are causal connection and entitlement to ongoing medical presumption to Section 8A, temporary total disability benefits, and the nature and extent of the injury. All aspects of the case involve factual determinations made by the commission. And therefore, as we know, the manifest weight of the evidence standard applies to everything. So if I'm to convince you to reverse the decision of the commission, I need to also convince you that the opposite conclusion here is clearly the proper results. And in this instance, everything comes down to the causal connection, in my opinion. The Workers' Compensation Commission rendered a decision that said that as of the date of trial, the current state of ill-being was not related to the exposure accident of May 7 of 2013. And specifically noted that no doctor testified that the current state of Isn't that true, Mr. Kress? Isn't that true? Dr. Tudor, I mean, he gave an opinion early on. It would appear that his deposition testimony was based on his examination of the claimant three and a half months after the work accident. What current opinion is there regarding the current condition of the claimant? Is there anything from Tudor regarding the current condition of the claimant? Dr. Tudor testified that the condition was related. And in his report, he wrote that it was unequivocally related, that she had this reactive airway dysfunction syndrome. And when questioned at his deposition, which took place on 12-8 of 2016, his testimony was that as of that day, she still needed to monitor her environment. She still wasn't fit to be doing work, such as the accommodated position that was offered to this plaintiff at the zoo at the park district. Did he also indicate that his testimony was based on his examination in 2013? It's true. This was respondent section 12 examiner. They didn't opt to have her re-examined by him. The best we could do was ask him his opinions about what he felt about this claimant. And how does that relate to the current condition? The current condition is one that as of the date of that deposition, he still opined that she needed work restrictions for it, and that it was still something that was a potentially fatal condition with the proper trigger, which you have to then presume then she still has the condition. And then you say, well, where did it come from? And again, his opinion is that it unequivocally came from the exposure. What was Dr. Crabtree's opinion? Dr. Crabtree's opinion is that her condition was unlikely to reverse, and that she also had this condition. And he said it's not usually a permanent process in his deposition, but that it was unlikely to reverse for her and that she would to take medications possibly for life. It's oversimplifying Crabtree's opinions. Crabtree had some major problems with the credibility of the claimant, didn't he? Absolutely. Suspected that she was smoking when she said that she wasn't. That her symptoms were not all consistent with the clinical exam and the testings. He even went so far at one point to say that he couldn't tell whether a claimant had an acute disease or if she actually does not want to work. Now that sounds like a major credibility problem, doesn't it? Absolutely. And credibility is certainly something that the commission should and did determine or rule upon. But at the end of the day, also Crabtree said, but she had the positive methylcholine test. So objectively, this is what it is. And again, at his deposition, this deposition was taken in June of 17, five months prior to the trial. Also, I believe that to be related. I believe she has the condition. I believe it to be related. So was the question phrased to him currently? Do you currently believe that this minute with that specificity of language? Well, no, I suppose not. But when he was asked, what is the current state of well-being and is it related? He said yes. He said it was related. And that was five months prior to the trial. Didn't he say that the claimant's subjective complaints were not supported by the objective findings? Didn't he say that? He said that. And so what does that mean? That she was laying it on a little thick. Commission, I think, took it a little bit further than that. They did. But they also ignored the objective tests and the opinions based upon those objective tests to find no causal relationship when both doctors opined that there was one. The commission also spent a lot of time talking about gaps in the treatments. They also thought for the claimant's credibility. How do you explain the gaps in the medical treatment? Well, as is indicated in my brief, she moved to Michigan City, Indiana. There's treatment from a primary care doctor named Dr. Molina there that references treatment with a doctor named Dr. Dickover, whose report is not in the record. And I admit, I don't know how and why it's not. So she saw a doctor, I think, on a one-time occasion in 2015. And we don't have it, unfortunately. What I would suggest is that there is a period of time where this respondent, this defendant, took the position that she should be using public aid. And that created a difficulty for her to receive treatment. That's how best I can explain why she wasn't active in treatment for those years. And that would explain the gap. She was getting samples for her medications and not seeing the doctors as frequently as she should have. Well, she did see doctors for other issues, but not for an alleged breathing issue. Is that correct? She saw doctors in Michigan City, Indiana. Yes, that is correct. But not for the breathing issues or problems, right? Correct. Okay. Mr. Kress... Excuse me? Mr. Kress, page two of your reply brief, you write, the medical opinions of both experts in this matter are that the plaintiff suffers a permanent respiratory condition. And I have two questions, two parts of that that I want to ask you about. What is the respiratory condition that you refer to in there that both experts are consistent on? I would say that the condition is called reactive airway dysfunction syndrome. Okay. Taking that then, and going to the primary point of the sentence, which you underlined the word permanent. So did either of the experts in their depositions indicate that this was a permanent condition? Did they use that word? If, and again, we're talking about language, right? If the doctors say that she needs to be on lifelong medication and that she needs, and that was Dr. Crabtree, and that she needs to be in control of her environment, I would say that's permanent in nature. If they're saying that she needs to take those steps to maintain her health and avoid a triggering event, then that's a permanent condition. Okay. So that's the first approximation that you're getting to when you use the word permanent. When you say that the two experts say that she has a permanent respiratory condition, what you just mentioned is what you're basing that statement on. That Dr. Crabtree indicated that she needs to be on medication for her lifetime. Yes, Your Honor. Okay. All right. Thank you. So once we get to causal connection, and if Your Honors would entertain the idea of reversing a manifest weight here, we get to the entitlement to medical benefits under Section 8A, which I believe should be reversed as well. There's a period of temporary total disability benefits from the date June 7, 2014 through, I put it at the date of the Dr. Tudor deposition, November the 21st of 16, wherein he was still opining that the accommodated position that the respondent, the defendant offered to the plaintiff was inappropriate for her. So I suggested to the commission, the circuit court, and to this court that that's the period of TTD that should have been awarded based upon Dr. Tudor's opinion about what was safe and what was not safe for her to do in terms of work. And then the fourth prong of my argument, or the fourth element of our appeal is that the commission undervalued the permanent partial disability, and that it did so because it found a condition that wasn't causally related anymore. And if the commission were to, on remand, see that the condition is in fact related based upon the opinions of Dr. Tudor and Dr. Crabtree, then it would revisit the amount of permanent partial disability awarded. Any further questions? Have you concluded your argument, Mr. Kress? I have, thank you. Okay, you'll have time to reply. Mr. Bhima, you may respond. Good afternoon. May it please the court, council, Ken Bhima, I represent the Springfield Park District. The Illinois Workers' Compensation Commission correctly decided all issues. There's more than enough evidence to support their unanimous decision it should be affirmed in its entirety. As you pointed out, at the heart of that decision is causation. And the commission unanimously found that Petitioner lacked credibility and they questioned her motives. What is consistent is the testimony in medical records of Dr. Crabtree, who routinely questioned the credibility of Petitioner. Petitioner at the time of trial indicated that because of all these triggers that would cause her to become symptomatic, she was essentially homebound. In addition to Dr. Crabtree questioning that, we've got, first of all, the social network entries from Petitioner. An example of this is early on when she's treating with Dr. Crabtree and telling Dr. Crabtree that she's unable to work and she cannot go anywhere because of the triggers. There's an entry where she's in St. Louis at a Rams game, despite these alleged triggers that prevent her from working. Consistently throughout the social network documents that she's basically living a normal life, this is consistent with what is seen on the surveillance video. So the commission looked at the opinion of Dr. Crabtree. Wasn't there also surveillance showing her smoking on a couple of occasions at least? Consistently smoking, correct, on almost every occasion which was documented by Dr. Crabtree where she would deny smoking and then it would be revealed in testing that she was. So the commission looked at all this evidence and indicated that what was consistent with Dr. Crabtree's opinions, what was found in the social network, the surveillance, and then as the commission noted when arbitrator Lindsay heard this case, which lasted about an hour and a half, she noted that there was no triggers that were bothering Petitioner during her testimony. Can I ask you a question? During his deposition, did Crabtree testify that he diagnosed her with restrictive airways dysfunction syndrome or some other persistent airway reactivity? Did he testify to that? Correct. Dr. Crabtree's testimony was that Petitioner had reactive airway disease syndrome but most importantly testified that this is not a permanent condition and that lungs will heal. I think he indicated in months or a year. Let me take this one further. Was Crabtree asked whether the condition was causally related to her inhalation of chemicals and did he answer that is correct adding that the condition was not related to at the time that Dr. Crabtree saw Petitioner, he testified that there was a causal relationship between that reactive airway disease syndrome and the exposure at work. Correct. I think what what the commission found to be significant was Dr. Crabtree's testimony that this condition is not permanent. When he last saw her, he had no signs of it. The x-rays documented no findings of it. His physical examination documented no findings of it and the peak flow study demonstrated no findings of that. Subsequently, Petitioner goes three years where she's treating for other conditions and her pulmonary complaints are negative. The commission correctly found that months before trial, she goes to Dr. Molina and notes that she's having conditions and even Dr. Crabtree, despite her strong smoking history, he diagnoses her with bronchitis which Dr. Crabtree testified was no longer related to her exposure that she did not have chronic bronchitis and he did testify that smoking is the number one cause of bronchitis. So in addition to those three years of gaps in treatment, that's when we see the social network entries. We see the surveillance all supporting the notion that the commission found that she was asymptomatic during that time. Lastly, regarding the TTD and permanency issue, again the commission, this is their function, this is their job. Unanimously, they correctly decided these issues. They again looked at credibility. They looked at the employer making a good faith offer to work within the restrictions. Petitioner's refusal, as I indicated, I think it's the commission's function to assess credibility. It's the commission's function to look at the medical providers and decide which one's most believable based on the entirety of the evidence. The commission did their job. They unanimously found petitioner lacked credibility. Her current condition was not related and there's more than enough evidence to support that decision. Okay, thank you Mr. Dima. Thank you. Mr. Kress, you may reply. Thank you. I want to address the issue of smoking and I'll just note that Dr. Tudor reviewed surveillance video of the claimant smoking. While I would echo his warnings that smoking isn't good for anybody, it didn't sway his opinion and said this isn't about smoking, it's about the reactive airway dysfunction syndrome. In particular, in oral arguments, Commissioner Simpson was quite taken aback by the smoking, but Dr. Tudor addressed that and said it did not change his opinion. Again, I'll repeat something that was in my brief. When we're weighing competing medical opinions, deference goes to the commission, but I would suggest that there are no competing medical opinions. They're both in agreement that the asked the question of me, each of them indicated an ongoing situation that is in need of medication and potentially fatal. I have a daughter with a severe tree nut allergy and she carries an EpiPen everywhere she goes and she's never had an incident other than the first one, but that doesn't mean she doesn't have the condition and it doesn't mean that something can't happen to her or she has a potentially life-threatening event. Thank goodness that hasn't happened to her, thank goodness that hasn't happened to this plaintiff, but I would suggest that the condition is real, it exists, and that both experts in this case believe it to be causally related. For that reason, I'd ask that you reverse the decision of the commission. Thank you, Mr. Kress. Mr. Kress and Mr. Beema, thank you both for your arguments on this matter this afternoon. It will be taken under advisement and a written disposition shall issue. Thank you for participating.